# 21-55241

## In the
## United States Court of Appeals
## For the Ninth Circuit



STILLWATER LTD, a United Kingdom Company,

*Plaintiff-Counter-Claim-Defendant-Appellant,*

v.

ANTONIA BASILOTTA,

*Defendant-Counter-Claimant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES
CASE NO. 2:16-cv-01895-SK
HONORABLE STEVE KIM

## BRIEF FOR PLAINTIFF-COUNTER-CLAIM-DEFENDANT-APPELLANT

ANTHONY MOTTA
*Attorney for Plaintiff-Counter-Claim-Defendant-Appellant*
64 Fulton Street, Suite 305
New York, New York 10038
Telephone: (914) 589-5356
Facsimile: (332) 777-1875
amotta@anthonymotta.com

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

The Appellant, Stillwater, Ltd. ("Stillwater" or "Appellant"), has no parent corporation and no portion of its shares of stock is owned by any publicly traded corporation.

Dated: July 19, 2021

/s/ Anthony Motta

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ............................................................1
    A.    Basis of the District Court's Subject Matter Jurisdiction. ....................1
    B.    Basis of the Court of Appeal's Jurisdiction. ...........................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................1

STANDARD OF REVIEW ......................................................................2

STATEMENT OF THE CASE ..................................................................2
    A.    Nature of the Action. ...............................................................................2
    B.    Statement of Facts. ..................................................................................3
    C.    The Conclusions of Law of the District Court ......................................9
        1.    Objective Manifestations of a Shared Intent ............................10
        2.    Superintended the DSR's By Exercising Control. ..................12
        3.    Whether the Audience Appeal of the DSR's Turns on Both
                Contributions..............................................................................16
    D.    The Judgment .......................................................................................18

SUMMARY OF THE ARGUMENT ......................................................18

ARGUMENT ..........................................................................................21

POINT I
MATHIESON IS A JOINT AUTHOR OF THE DSR's .......................21
    A.    Applicable Law .....................................................................................20
    B.    Mathieson and Radialchoice Superintended and Controlled the
        Recording of the DSR's ....................................................................22
    C.    Mathieson is a Co-Author Given His Traditional Collaboration
        Relationship of Producer/Performer with Basil ..................................25
    D.    No Showing Was Made that the Audience Appeal of the DSR's Stems
        Solely or Primarily From the Performance by Basil .........................32

POINT II
ONLY 50% OF THE COPYRIGHTS IN
THE DSR's HAVE REVERTED TO BASIL ........................................................32

CONCLUSION.........................................................................................33

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000)................................................

................................................................9, 10, 17, 18, 20, 21, 22, 23, 24, 25

*ABS Entm't, Inc. v. CBS Corp.*, 900 F.3d 1113 (9th Cir. 2018)........................20, 28

*Ashton-Tate Corp. v. Ross*, 916 F.2d 516 (9th Cir. 1990) ......................................21

*Batjac Prod. Inc. v. Goodtimes Home Video*, 160 F.3d 1223 (9th Cir. 1998).........28

*Burrows-Giles Lithographic Co. v. Sarony,* 111 U.S. 53 (1884)......................22, 24

*Childress v. Taylor*, 945 F.2d 500 (2d Cir. 1991)...........................11, 14, 24, 28, 29

*Creative Dream Productions, LLC v. Houston*. 2015 WL 12731915 (C.D. Cal.
April 2, 2015) .........................................................................................................15

*Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 739 F.3d 446 (9th Cir. 2014) ....................27

*Janky v. Lake County Convention*, 576 F.3d 356 (7th Cir. 2009)...........................11

*Mapp v. UMG Recordings, Inc.*, 208 F. Supp. 3d 776 (M.D. La. 2016) .................31

*Mathews v. Chevron Corp.*, 362 F.3d 1172 (9th Cir.2004) ......................................2

*Morrill v. the Smashing Pumpkins*, 157 F. Supp. 2d 1120 (C.D. Cal. 2001) .......... 15,
20, 26, 32

*Newton v. Diamond*, 204 F. Supp. 2d 1244 (C.D. Cal. 2002), *aff'd,* 349 F.3d 591
(9th Cir. 2003)........................................................................................................13

*Olander Enterprises, Inc. v. Spencer Gifts, LLC*, 812 F. Supp. 2d 1070(C.D. Cal.
2011**)** ....................................................................................................................28

*Pye v. Mitchell*, 574 F.2d 476 (9th Cir. 1978) ........................................................... 33

*Richlin v. Metro-Goldwyn*, 531 F.3d 962 (9th Cir. 2008) .......... 10, 17, 18, 21, 22, 27

*Scorpio Music S.A. v. Willis*, 2012 WL 1598043 (July 7, 2012 SD Cal) ........... 32, 33

*Staggers v. Real Authentic Sound*, 77 F. Supp. 2d 57 (D.D.C. 1999) ............... 30, 31

*Systems XIX, Inc. v. Parker*, 30 F. Supp. 2d 1225 (N.D. Cal. 1998) ........... 20, 29, 30

*Thomson v. Larson*, 147 F.3d 195 (2d Cir. 1998) .............................................. 11, 15

*Trinity Theater, Inc*., 13 F.3d 1061 (7th Cir. 1994) .................................................. 32

**Statutes**

28 U.S.C. §1331 ........................................................................................................ 1

17 U.S.C. § 101 ................................................................................................. 1, 9, 21

17 U.S.C. §203 ...................................................................................................... 2, 32

28 U.S.C. §1291 ......................................................................................................... 1

28 U.S.C. §1338(a) ..................................................................................................... 1

**Rules**

Fed. Rule Civ. Proc. 12(b)(6) .................................................................................. 16

**Other Authorities**

1 *Nimmer on Copyright* § 2.10 [A][3] (2001) ...................................................... 19, 26

2 *Patry on Copyright*, §5:21 at 5-68 (2012) ........................................................... 11

H.R. Rep. No, 94-1476 ..................................................................................... 14, 19, 29

U.S. Copyright Office Practices §803.3 (3rd Ed. 2014) .................................... 19, 27

.

## JURISDICTIONAL STATEMENT

**A.** <u>**Basis of the District Court's Subject Matter Jurisdiction**</u>.

The District Court possessed subject matter jurisdiction over this matter

pursuant to 28 U.S.C. §§ 1331 and 1338(a) as this is an action brought under the

Copyright Act, 17 U.S.C. § 101, *et seq*.

**B.** <u>**Basis of the Court of Appeal's Jurisdiction.**</u>

The Court of Appeals has subject matter jurisdiction over the final decision

rendered by the District Court pursuant to 28 U.S.C. §1291. The Findings of Fact

and Conclusions of Law (Dkt. 169; Ex 3-22) was entered on February 5, 2020 and

the Judgment (Dkt. 136; ER 2) from which Appellant appeals was entered on

February 11, 2021. The notice of appeal (Dkt. 216; ER 314) was timely filed by

Appellant on March 15, 2021.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      The issue raised on the appeal is whether the producer involved in the

creation of the sound recordings at issue was a joint author thereby reducing the

portion of the copyrights that reverts to the Appellee, Antonia Basilotta p/k/a Toni

Basil ("Basil" or Appellee"), pursuant to 17 U.S.C. §203, reducing the share of the copyrights held by her, and reducing the amount of the Judgement awarded to Basil.

## STANDARD OF REVIEW

The Court reviews mixed questions of law and fact *de novo*; underlying factual findings are reviewed for clear error. *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir.2004).

## STATEMENT OF THE CASE

### A.    Nature of the Action.

Stillwater is the successor in interest to Radialchoice Limited ("Radialchoice") to the copyrights in ten sound recordings in which Basil was the featured vocalist. (ER 5–6. See also ER 32– 35). The sound recordings, referred to herein as the Disputed Sound Recordings or DSR's, are "Mickey", "You Gotta Problem", "Be Stiff", "Space Girls", "Nobody", "Thief on the Loose", "Little Red Book", "Time after Time", "Rock On", and "Shoppin' From A to Z". (ER 3, fn. 2). The DSR's were embodied on an album entitled *Word of Mouth.* (ER 5–6, 8). By notice dated March 20, 2013 Basil sought to terminate, effective June 16, 2016, the transfer of her copyright interest in the DSR's pursuant to 17 U.S.C. §203 (the "Notice to Terminate"). (Exhibit 16, ER 304–313). In this action Stillwater sought

.

a declaratory judgment as to the percentage of the copyright interest in the DSR's which reverted to Basil. Stillwater contends the copyright interest of the producer of the DSR's, Greg Mathieson, which had been assigned to Radialchoice, did not revert to Basil but remained with Stillwater. Accordingly it asserts on this appeal that 50% of the copyright interest reverted to Basil and 50% remained with Stillwater.

**B.**     **Statement of Facts.**

The facts set forth below are taken from the Findings of Fact and Conclusions of Law (ER 3-22) made by the District Court, from the testimony elicited at trial, and from the Exhibits admitted at trial[1].

Between 1979 and 1982 Basil entered into written agreements concerning the DSR's with Radialchoice, a UK recording company formed by Simon Lait ("Lait") in 1979. (ER 5).

Lait had formed Radialchoice to embark on a new musical concept, albums containing music videos instead of sound recordings. (ER 6). Lait sought visually

---

[1]The matter was tried before Judge Steve Kim on December 9, 2019 and December 10, 2019. Two witnesses testified, Simon Lait on behalf of Appellant and Basil as Appellee.

literate artists to create not only the sound recordings but accompanying music videos to be released in album format. (Id).

Lait met Basil in 1979. (ER 6). After meeting with her Lait decided she was the type of musically visually literate artist he was looking for.  (Id).  He asked her to sign with Radialchoice and Basil agreed to record three songs to start.  (Id).

When Basil met with Lait 1979 she was an inexperienced music recording artist with no track record of success. Basil testified at trial that prior to 1979 she studio recorded one song entitled "Breakaway" and an album, *The Basil*. (ER 134, Lines 6-11; ER 136, Lines 8–16).  After her collaboration with Radialchoice Basil recorded no other studio albums. (ER 138, Lines 16–17).

Radialchoice and Basil entered into an agreement dated August 31, 1979 (the "1979 Agreement") which provided for the recording of the three songs. (Exhibit 1, ER 177–192). The three songs recorded were "Space Girls", "Be Stiff and "You Gotta Problem". (ER 50, Line 11–14).  The songs were chosen by Basil. (ER 7).

The 1979 Agreement provided that if any of the master recordings was not of a satisfactory technical standard Radialchoice could require Basil to re-record it. (ER 6. Exhibit 1, ER 181, ¶ 4(b)).  The parties struck out language that would have permitted Radialchoice to require re-recording if a sound recording did not meet a

.

satisfactory "artistic standard". (Id). As required by the 1979 Agreement Radialchoice financed the cost of studio musicians, producers, and other costs associated with the recordings. (Id). The 1979 Agreement required Radialchoice to pay a nonreturnable advance of $7,500 to Basil, which it did. (ER 7).

Radialchoice and Basil agreed that Greg Mathieson ("Mathieson") would be the producer of the first three sound recordings. (ER 7). Basil's manager, Brian Avnet, recommended Mathieson as the producer. (ER 139, Lines 12–21). Radialchoice and Mathieson entered into a producer agreement dated August 21, 1979 (the "Producer Agreement"). (ER 7, Exhibit 5, ER 275 – 283). The Producer Agreement stated that Mathieson's interests in the sound recordings would vest in Radialchoice as its sole property. (ER 7, Exhibit 5, ER 277).

Mathieson was required under the Producer Agreement to:

a) Arrange and schedule all meetings and recording sessions for the recordings of the three songs;

b) Ensure that musicians and vocalists appeared as required;

c) Obtain the best possible performances from the vocalists and musicians;

d) Provide creative input as to the recording of the three songs;

-5-

e)      Ensure that the sound recordings were technically satisfactory and commercially suitable. (ER 7).

After the first three songs were recorded Radialchoice and Basil entered into an agreement dated October 1, 1980 amending the 1979 Agreement and providing for the production of additional sound recordings to be embodied on a long playing album which became *Word of Mouth* (the "1980 Agreement").  (ER 7-8.  Exhibit 2, 193–200). One of the additional sound recordings was the song "Mickey" which became a "hit" and the song for which Basil has become known.

The 1980 Agreement did not give any artistic control to Basil as she had under the 1979 Agreement on the first three sound recordings.  Instead it amended the 1979 Agreement giving final approval to Radialchoice that the additional sound recordings were both technically satisfactory and commercially suitable.  (ER 6; Exhibit 2, ¶ 5. ER 196). As a result, the right of Radialchoice to require re-recording was extended to any sound recording not commercially suitable.

Radialchoice entered into a Supplemental Producer Agreement with Mathieson dated June 16, 1980 (the "Supplemental Producer Agreement") which supplemented the Producer Agreement to cover the additional sound recordings. (ER 8-9. Exhibit 6, ER 284–287).  Except as amended the terms of the Producer

.

Agreement applied to the additional sound recordings and the Producer Agreement governed the rights of Radialchoice in the additional recordings. (ER 285: Exhibit 6). Mathieson had the same responsibilities as under the Producer Agreement. (ER 6–7). The Supplemental Producer Agreement required Mathieson to submit to Radialchoice a written budget for approval. (Id). This he did. (ER 287).

"Mickey" was derived from a composition entitled "Kitty" and was one of many tapes submitted to Radialchoice by music publishers and songwriters to be considered for inclusion on *Word of Mouth*. (ER 7). Radialchoice and Basil jointly agreed to include "Mickey" and six other songs on *Word of Mouth*. (ER 7).

As witnessed by Lait and his assistant, Mathieson performed the duties of a producer on the sound recordings including scheduling and arranging recording sessions, securing the attendance of musicians, providing direction to musicians, and overseeing the recordings to obtain the best possible performances. (ER 7). He also mixed the master tapes. Basil helped Mathieson with the mixing of the master tapes. (Id).

Mathieson is listed on the back album jacket at the top as a credited producer. (ER 10). The jacket also credits the musicians, the cheerleaders who provided the "stomping" on "Mickey", and the persons who supplied the back cover image, the

cover photo and design. (Id). Radialchoice paid the advances to Basil and Mathieson required under their respective agreements. (ER 7, 9). Radialchoice paid the costs involved in the creation of the DSR's as set forth in Mathieson's recording budget including studio expenses (ER 11), and the expenses for musicians and the other individuals involved in the creation of the DSR's. (ER 8).

*Word of Mouth,* in addition to being a sound recording album was also turned into one of the first music video albums. (ER 6). No claims are asserted as to the music video album or the visual performances embodied thereon. They were not part of the of the dispute resolved by the District Court. (Id).

After the recording of the DSR's Radialchoice entered into an agreement with Basil dated August 9, 1982. (ER 11. Exhibit 1, ER 201–269). In or about 1983 Radialchoice released her second album entitled *Toni Basil*. (ER 11). Radialchoice had required the re-recording and re-mixing of the sound recordings embodied on the second album because Lait, on behalf of Radialchoice did not "like" the initial recordings. (ER 84, Line 9 to ER 85, Line 7). The album was a commercial failure and ended the relationship between Radialchoice and Basil. (Id). As noted, Basil recorded no subsequent album with anyone else.

.

## C.    The Conclusions of Law of the District Court.

The District Court found that the Notice of Termination caused a reversion to her of the entire sound recording copyrights in the DSR's.[2]  (ER 21). In so holding the District Court found that Mathieson was not a joint author of the DSR's. (Id). It cited to the criteria for a joint work set forth in 17 U.S.C. §101 providing that a joint work requires: (1) a copyrightable work; (2) two or more "authors", and (3) an intent by the authors that their contributions be merged into inseparable or interdependent parts of unitary whole. The District Court found that two of the three criteria were satisfied. The DSR's are copyrightable works and those involved in their production intended for their contributions to combine into a unitary whole. (Id). The District Court found that there were not two or more "authors" because it held the requirements of *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000) were not satisfied.  (Id).

*Aalmuhammed* requires the review of several factors to determine whether a work is jointly authored.  They are: (1) what "objective manifestations of a shared

---

[2] Appellant challenges solely the failure of the District Court to recognize Mathieson as a joint author of the DSR's and its holding that his portion of the copyrights reverted to Basil.  Appellant does not appeal the portion of the conclusions of law holding that the musicians were not joint authors.

intent" to be co-authors existed; (2) how much each putative co-author "superintended the work by exercising control"; and (3) if the "audience appeal of the work" stemmed from each co-author's contribution in a way that "the share of each facet of its success cannot be appraised". *Id* at 1234. See also *Richlin v. Metro-Goldwyn*, 531 F.3d 962, 968 (9th Cir. 2008).

The District Court found that while Mathieson made a copyrightable contribution (ER 16) application of the *Almuhammed* criteria for joint authorship did not result in a finding that Mathieson was a co-author. The findings of the District Court will be reviewed below.

**1.    Objective Manifestations of a Shared Intent**. The District Court noted that a contract evidencing an intent to be co-authors was not produced requiring it to look at other evidence of dispositive intent. (ER 17).  It found that Basil's testimony at trial that she had no intent to share authorship of the DSR's, coupled with Lait's testimony that the notion of joint authors never crossed his mind, to be indicative of the lack of the requisite intent. (Id).

The reasoning is flawed.  Basil's subjective statement as to her state of mind made at trial cannot be considered an objective manifestation of intent. *Aalmuhammed supra* at 1234 ("We say objective manifestations because, were the

-10-

.

mutual intent to be determined by subjective intent, it could become an instrument or fraud, were one co-author to hide from the other an intention to take sole credit for the work"). See also *Thomson v. Larson*, 147 F.3d 195, 201 (2d Cir. 1998) ("But it is also clear that the intention standard is not strictly subjective. In other words, co-authorship intent does not turn solely on the parties' own words or professed state of mind".)

Lait's statement is also not indicative of a lack of intent. Joint authorship does not require an understanding of the legal consequences of the relationship. *Thomson supra* at 202, citing to *Childress v. Taylor*, 945 F.2d 500, 508 (2d Cir. 1991). See also 2 *Patry on Copyright*, §5:21 at 5-68 (2012) ("[J]oint authorship does not depend on the parties' legal intentions" citing to *Janky v. Lake County Convention*, 576 F.3d 356, 362 (7th Cir. 2009).

Radialchoice's and Lait's objective manifestation made at the time the DSR's were recorded is that both Basil and Mathieson were authors. The 1979 Agreement, the 1982 Agreement and the Producer Agreement provided that the copyright interests of Basil and Mathieson were transferred to Radialchoice and each were to be paid royalties based upon the sale of the DSR's. (ER 178: Exhibit 1, 1979 Agreement ¶ 2 [transfer of copyright] and ¶ 8 [payment of royalties]; ER 217:

Exhibit 3, 1982 Agreement ¶ 3.4 [payment of royalties] and ¶ 4.1.2 [transfer of copyright]. ER 277: Exhibit 5, Producer Agreement ¶ 3(b) [payment of royalties] and ¶ 3(a) [transfer of copyright]).  This was an acknowledgment that each held a copyright interest.

> 2.      **Superintended the DSR's By Exercising Control**. The District Court examined whether "Mathieson exercised creative control to be an author".  (Id.)  It found Lait's testimony as to the responsibilities of a music producer, and what he saw Mathieson actually do, to be "too generic". It instead focused on Basil's testimony that (1) she originated the "cheerleading" and "stomping" concepts for "Mickey", (2) Mathieson was an inexperienced producer, and (3) she helped Mathieson mix the master tapes.  While the District Court found Basil's claim that she was the artistic "mastermind" of the DSR's to be self-serving it stated there was corroboration in the 1979 Agreement which removed from Radialchoice's contractual control the requirement that the recordings of the first three songs meet a satisfactory "artistic" standard.  (ER 18).  It ultimately found the factor to be "at most neutral" and not tipping in Appellant's favor.  (Id.)

The "stomping" and "cheerleading" referenced by the Court is only as to the sound recording "Mickey" and is not evidence that Basil superintended the creation

.

of "Mickey" or the other nine sound recordings comprising the DSR's. Moreover, it shows only a contribution to the underlying musical composition of "Mickey" which is a separate copyright from the sound recording and is not at issue. *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1249 (C.D. Cal. 2002), *aff'd,* 349 F.3d 591 (9th Cir. 2003). ("Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights.") The Notice of Termination (ER 304, Exhibit 16) was only as to the sound recordings and not the musical compositions.

While Mathieson may have been an inexperienced producer he still oversaw and superintended the recording process with Basil's consent. Basil's testimony shows that she was an inexperienced sound recording artist without any prior record of success. Before her association with Radialchoice she had studio recorded one single (ER 132, line 6-8) and one album. (ER 136, lines 8-16). There is no dispute that at the time she was approached by Radialchoice in 1979 she was not an established, successful recording artist whose name and reputation alone would drive sales of a recorded single or album. She was not a performer upon whom a record label would entrust ultimate control over the recording of an album.

-13-

The District Court ignored that the 1979 Agreement only dealt with three of the ten sound recordings comprising the DSR's, and not with the most successful sound recording: "Mickey". As to "Mickey", and the remaining six sound recordings, Radialchoice possessed the right to require the re-recording of any of the sound recordings that were either not technically satisfactory or commercially suitable. It retained ultimate creative control and actually controlled the recording process through its agent Mathieson.

The District Court references, but fails to take into account, the Legislative History of the Copyright Act, H.R. Rep. No, 94-1476 at 56, which provides that a producer of a sound recording is generally considered a joint author with the performer unless the producer's activities are minimal[3].

_____

[3]H.R. Rep. No, 94-1476 at 56 states:

"The copyrightable elements in the sound recording will usually, though not always, involve 'authorship' both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make a final sound recording. There may, however, be cases where the record producer's contribution is so minimal that the performance is the only copyrightable element in the work, and there may be cases (for example, recording of bird calls, sound of racing cars, etc.) where only the record producer's contribution is copyrightable."

-14-

.

As stated in *Thomson supra* at 202, fn. 17, "co-authorship intent will vary depending on the specific factual circumstances". It premised this on *Childress supra* at 508 stating that the issue of co-authorship intent "requires less exacting consideration in the context of traditional forms of collaboration, such as between the creators of the words and music of the song." The producer and performer of a sound recording is such a "traditional form of collaboration".

The District Court failed to take this traditional form of collaboration into account. While it stated that producer/performer co-authorship "may be true for cases in the mean" (ER 19), it failed to explain why the "mean" was inapplicable.

Instead the District Court cited to *Creative Dream Productions, LLC v. Houston*, 2015 WL 12731915 (C.D. Cal. April 2, 2015) for the proposition that a presumption of joint authorship would short-circuit the analysis required by the Ninth Circuit. *Creative Dream* is inapposite. There, plaintiff, the creator of a music video, claimed to be the sole author exclusive of the performer in the video. Defendants did not rely upon the traditional collaboration between the producer of a music video and performer to argue there was joint authorship. See *Morrill v. the Smashing Pumpkins*, 157 F. Supp. 2d 1120, 1124 (C.D. Cal. 2001) (Finding that the nature of the relationship between a producer of a music video and the performers

-15-

depicted was that they were joint authors). Instead defendants argued that in the absence of a work for hire agreement any party who makes an independent copyrightable contribution is presumed to be a joint author. The Court rejected this argument in denying defendants' Rule 12(b)(6) motion to dismiss.

Here, the District Court found that Mathieson performed all the responsibilities typically undertaken by the producer of a sound recording. He scheduled and arranged the recording sessions, secured the attendance of musicians, provided direction to musicians, oversaw the recordings to obtain the best possible performances, and mixed the master tapes. (ER 7 and 9). No finding was made that Basil performed any of these responsibilities other than "helping Mathieson mix the master tapes". (ER 18). The relationship therefore fell within the traditional collaboration of producer/performer.

**3.    Whether the Audience Appeal of the DSR's Turns on Both Contributions**. The District Court found the audience appeal of the DSR's was predicated solely on Basil's performance because (a) Basil was selected by Radialchoice because of her "unique audiovisual creativity", and (b) Lait placed the failure of the second album, *Toni Basil,* on Basil which the Court found suggested

.

that the success of the first album, *Word of Mouth*, was based on how Basil performed.  (ER 19).

While Basil's "audiovisual creativity" may have been a factor as to any success enjoyed by the music videos created using the DSR's, it is not relevant to the DSR's themselves[4].

The lack of success of the second album is not proof that *Word of Mouth* was successful solely or primarily because of Basil's performance. Lait's testimony was that *Toni Basil* was not successful because Basil had more creative control over the recording of its sound recordings, and it was not a collaborative effort with Radialchoice.  (ER 84, Line 9 to ER 85, Line 7).  *Word of Mouth* was successful precisely because of the collaboration among the parties, not solely because of Basil's performance.

The test is whether the " 'audience appeal of the work' can be attributed to both authors, and whether 'the share of each in its success cannot be appraised'" *Richlin v. Metro-Goldwyn*, 531 F.3d 962, 970 (9th Cir. 2008) citing *Aalmuhammed supra* at 1234.  If the work of the individual claiming to be the sole author is not

---

[4] As noted the producer of a music video and the performer would generally be considered joint authors.

-17-

determined to be the reason for the audience appeal of the work, then it is attributed to all who made a copyrightable contribution. *Richlin supra.* Here, the share of Mathieson and Basil to the DSR's cannot be separately appraised, particularly since Basil was not an established and well-known recording artist at the time *Word of Mouth* was released. This factor therefore does not point to Basil as being the sole author.

**D.    The Judgment.**

The District Court's judgment entered February 11, 2021 (the "Judgment") (ER 2) found for Basil on Stillwater's claim seeking declaratory relief as to the proportion of the copyright in the DSR's reverting to Basil. It awarded on Basil's accounting counterclaim $96,695 as the income generated from the DSR's from June 16, 2016, the effective date of the Notice of Termination.

## SUMMARY OF THE ARGUMENT

Mathieson is a joint author of the DSR's under the criteria set forth in *Aalmuhammed supra.*

First, *Aalmuhammed* states an "author" is an individual who superintended the work and served as the inventor or creative mastermind. Control is the most important factor. Radialchoice, and Mathieson as Radialchoice's producer and

-18-

.

agent, originated and caused the DSR's to come into being. Radialchoice instigated and paid for the creation of the DSR's, selected Basil to be the recording artist and vocalist, selected and approved the compositions to be recorded, and selected or approved the musicians and other individuals involved.

Second, because the roles of producer/performer is a traditional collaboration in the creation of sound recordings it is unnecessary to adhere to the requirement of proof of shared intent to be co-authors. The producer and performer of sound recordings are recognized in the industry as being joint authors as evidenced by multiple sources.

Nimmer, at 1 *Nimmer on Copyright* § 2.10 [A][3] (2001), states that the copyright in a sound recording is shared by the producer and performer where each makes an original contribution. The U.S. Copyright Office in its Compendium of U.S. Copyright Office Practices §803.3 (3rd Ed. 2014) states the same thing as does the Legislative History of the Copyright Act at H.R. Rep. No. 95-1476 at 56. Where the producer of a sound recording makes a creative contribution the producer is considered a co-author with the performer.

Finally, this Court and other Courts within the Ninth Circuit have recognized that the producer/performer relationship is a traditional collaboration in which the

-19-

music producer is a co-author with the performer. *ABS Entm't, Inc. v. CBS Corp*., 900 F.3d 1113 (9th Cir. 2018), *Morrill v. the Smashing Pumpkins*, 157 F. Supp. 2d 1120 (C.D. Cal. 2001), *Systems XIX, Inc. v. Parker*, 30 F. Supp. 2d 1225 (N.D. Cal. 1998).

Third, there is no proof that the audience appeal of the DSR's is driven solely or primarily by the performance of Basil giving rise to the assumption that the audience appeal is driven by the copyrightable contributions of Basil, Mathieson and the others involved in the creation of the DSR's. This supports a finding of joint authorship.

As Stillwater holds the 50% copyright interest of Mathieson in the DSR's only the remaining 50% of the copyright reverts to Basil as a result of the Notice of Termination. The District Court was incorrect in finding 100% of the copyright reverted to Basil.

.

# ARGUMENT

# POINT I

# MATHIESON IS A JOINT AUTHOR OF THE DSR's

## A.    Applicable Law

The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole. 17 U.S.C. §101; *Richlin*, 531 F.3d at 969. A joint work requires each author to make an independently copyrightable contribution. *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir. 1990).  The District Court correctly found that the DSR's are copyrightable works (ER 14), that the parties intended for their contributions to be combined into a unitary whole (Id), and that Mathieson made independently copyrightable contributions to the DSR's (ER 16). The issue remaining, and on which this appeal rests, is whether Mathieson and Basil are "joint authors".

A written agreement providing for joint authorship is dispositive. *Aalmuhammed* 202 F.3d at 1235.  In the absence of such an agreement the following factors are examined: whether (1) an alleged author superintended the work, served as "the inventive or master mind," or created or gave effect to an idea;

-21-

(2) there exists an "objective manifestation of a shared intent" to be co-authors; and

(3) "the audience appeal turns on both contributions and the share of each in its

success cannot be appraised." *Aalmuhammed supra* at 1233-1235. Each of the

factors will be reviewed below.

B.  **Mathieson and Radialchoice Superintended and Controlled the
    <u>Recording of the DSR's</u>**

Control is the most important factor in determining authorship.

*Aalmuhammed supra* at 1235; *Richlin supra* at 968; *Armes v. Post*, No.

2:20-cv-03212-ODW (PJWx) (C.D. Cal. Oct. 19, 2020).  An author is the person

"…to whom anything owes its origin; originator; maker…" *Burrows-Giles*

*Lithographic Co. v. Sarony,* 111 U.S. 53, 58 (1884).

Radialchoice, through Lait, originated and caused the DSR's to come into

being.  Radialchoice financed and paid for their creation, superintended the process

by initially selecting and ultimately approving the compositions to be recorded,

approved the musicians involved in the recordings, and contracted with Mathieson,

as Producer to act as its agent, to superintend and oversee the recording of the

DSR's. Under the Supplemental Producer Agreement it was Mathieson's

responsibility to devise and adhere to an agreed budget for the recording of the

DSR's.  (ER 286: Supplemental Producer Agreement, ¶ 3).

.

Basil was not the originator of the DSR's; they would never have been created if not for Radialchoice. The 1979 Agreement, as amended by the 1980 Agreement, provided that:

a)  Basil was to render her services to the best of her ability in recording the DSR's. (ER 178: 1979 Agreement, ¶ 2(a)).

b)  She assigned to Radialchoice "all rights of copyright and all other rights in and to the master recordings hereunder the performances embodied therein". (ER 178-179: 1979 Agreement, ¶ 2). Performance is defined as Basil's rendition of services "as a soloist or as a member of a group and whether as a vocalist instrumentalist leader or musician. (ER 190: 1979 Agreement ¶ 17(e)).

c)  In the event that her services did not result in technically satisfactory and commercially suitable sound recordings Radialchoice had the option to require that they be re-recorded. (ER 6: Exhibit 1; ER 181: 1979 Agreement ¶ 4(b)).

The agreements did not give Basil any obligation to superintend and control. The responsibilities imposed by the agreements are not indicative of an individual

who is to superintend or control the creation of sound recordings such as the DSR's. Basil's responsibility was to be a vocalist to the best of her ability, nothing more.

*Aalmuhammed* dealt with the claim of a technical consultant who sought a declaration that he was a joint author of the motion picture, *Malcolm X*. In reviewing and ultimately rejecting the claim the Court noted that the production company Warner Brothers, and the director, Spike Lee, controlled the production of the film. *Id* at 1235. Citing to *Burrows-Giles supra* it stated that it was Lee who "actually formed the picture by putting the persons in position and arranging the place". *Id.* Spike Lee was an author, and the plaintiff was not, because while he made valuable contributions to the movie they were accepted at the discretion of Lee. *Id.*

Here, like Spike Lee in *Aalmuhammed*, Mathieson was the individual who "put persons in position", and controlled the recording of the DSR's. As found by the District Court Mathieson scheduled and arranged the recording sessions, secured the attendance of musicians, provided direction to musicians, oversaw the recordings to obtain the best possible performances, and mixed the master tapes. (ER 7). Mathieson is an author.

.

## C.    Mathieson is a Co-Author Given His Traditional Collaboration Relationship of Producer/Performer with Basil

The nature of the relationship between individuals providing copyrightable contributions to a work is a factor as to the proof required to prove joint authorship. *Aalmuhammed supra* at 1235 makes clear that the factors it sets forth "cannot be reduced to a rigid formula, because the creative relationships to which they apply vary too much".

*Aalmuhammed* recognized that with traditional collaborations, such as the writers of music and lyrics to a song, it is easy to determine joint authorship. *Id* at 1233. The Second Circuit in *Childress*, 945 F.2d at 508, whose reasoning was adopted by the Court in *Aalmuhammed* at 1233–1234, stated that whether individuals regard themselves as joint authors "requires less exacting consideration in the context of traditional forms of collaboration, such as between the creators of the words and music of the song."[5]

---

[5]*Childress* did not deal with a traditional form of collaboration. It dealt with a claim of co-authorship by the defendant to a play about the comedian Moms Mabley written solely by the plaintiff. Defendant supplied research, ideas and characters used by plaintiff. *Id* at 502. This was insufficient to establish co-authorship in the absence of the parties sharing an intent to be co-authors. *Id* at 508.

-25-

The relationship of producer and performer of a sound recording is such a traditional form of collaboration. Provided an individual perform the duties and responsibilities typically associated with a producer, a producer has been consistently recognized and found to be a co-author with the performer.

Nimmer states that a copyright in a sound recording: "will be either exclusively in the performing artists, or (assuming an original contribution by the sound engineers, editors etc. as employees of the record producer), a joint ownership between the record producer and the performing artists". 1 *Nimmer on Copyright* § 2.10 [A][3] (2001). Here, the District Court specifically found that Mathieson made independent copyrightable contributions to the DSR's as producer. (ER 16).

In *Morrill v. the Smashing Pumpkins*, 157 F. Supp. 2d at 1126 the Court, citing Nimmer's statement as to the joint ownership of a sound recording copyright in the music producer and performer, analogized the relationship to that of a producer of a music video and the performers to find joint authorship. It stated:

> "The case of a music video is equally clear: absent a written agreement, the copyright for the music video is a joint ownership between performing artists and the video's producer (assuming an original contribution by the producer or employee of the producer)." *Id.*

-26-

.

The U.S. Copyright Office in its Compendium of U.S. Copyright Office

Practices §803.3 (3rd Ed. 2014) (the "Compendium") states authorship of a sound

recording is generally with the producer and performer. The Compendium states:

"There are two types of sound recording authorship:

• Authorship in the performance(s); and

• Authorship in the production of the sound recording.

Both the performer and the producer of a sound recording of a musical
performance or spoken word performance may contribute copyrightable
authorship to the sound recording. Generally the performance and
production are considered a single integrated work. In some cases, however,
the main or sole contribution may be production authorship (as in the
recording of bird songs, where there is no human performance) or the main
contribution may be performance authorship (as in a recorded performance
were the only production involved is to push the "record" button).

When interpreting the Copyright Act Courts generally defer to the Copyright

Office's interpretations set forth in the Compendium and opinion letters to the

extent the interpretations have the power to persuade. *Inhale, Inc. v. Starbuzz

Tobacco, Inc.*, 739 F.3d 446, 448-49 (9th Cir. 2014) (Deferring to and accepting the

Copyright Office's interpretation in the Compendium as to when the shape of a

useful article is copyrightable). *Richlin*, 531 F.3d at 973. ("We have held that

courts should generally defer to the Register of Copyright's ("Register")

interpretation of the copyright statutes, as '[t]he Register has the authority to interpret the copyright laws and….its interpretations are entitled to judicial deference if reasonable'", quoting and citing to *Batjac Prod. Inc. v. Goodtimes Home Video*, 160 F.3d 1223, 1230 (9th Cir. 1998). *Olander Enterprises, Inc. v. Spencer Gifts, LLC*, 812 F. Supp. 2d 1070, 1076 (C.D. Cal. 2011) ("[T]he Ninth Circuit has held that courts should generally defer to the register's interpretation of copyright statutes and regulations").

This Court has previously relied upon Copyright Office statements and internal documents to comment on the creative contributions and authorship of record producers.

In *ABS Entm't, Inc. v. CBS Corp.*, 900 F.3d 1113, 1131 (9th Cir. 2018) the Court, in deciding that analog sound recordings re-mastered in digital format did not create derivative works, made the following comment:

> "Nothing in this opinion should be construed to question or limit the creative contributions of the recording engineers and/or record producers responsible for the recording session that led to the initial fixation of the sound recording. The initial producer/engineer's role is often to work in collaboration with the performing artists to make many of the creative decisions that define the overall sound of the recording as fixed, including such things as microphone choice, microphone placement, setting sound levels, equipment used, processing filters employed, tapes selected, session structure, and other similar decisions analogous to the creative choices of photographers that courts have consistently held to be original. See United

-28-

.

States Copyright Office and Sound Recordings as Works Made for Hire: Hearing Before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary, 106th Cong. 2nd Sess. (2000) (statement of Marybeth Peters, Register of Copyrights) ("The copyrightable elements in a sound recording will usually, though not always, involve 'authorship' both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording."

As set forth *supra* at p. 14 the Legislative History of the Copyright Act shows that joint authorship of the producer and performer of a sound recording was within the specific contemplation of Congress at the time of enactment.  H.R. Rep. No. 94-1476 at 56 states:

> "The copyrightable elements in the sound recording will usually, though not always, involve 'authorship' both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make a final sound recording. There may, however, be cases where the record producer's contribution is so minimal that the performance is the only copyrightable element in the work, and there may be cases (for example, recording of bird calls, sound of racing cars, etc.) where only the record producer's contribution is copyrightable."

The Court in *Systems XIX, Inc. v. Parker*, 30 F. Supp. 2d 1225, 1228 (N.D. Cal. 1998) relied under a prior version of the Compendium and the Legislative History set forth above to find it was unnecessary to discern the subjective intent of a record producer and performer to determine whether there was joint authorship of

-29-

a sound recording.  In *Systems XIX* plaintiff recorded the live musical performance of a defendant, provided the master tapes of the performance to the defendants, who subsequently included two of the recorded songs on an album they released. *Id* at 1226-7.  Plaintiff sought producer credit and compensation and when defendants refused commenced an action for declaratory relief and damages. *Id* at 1227. Relying on *Childress* defendants argued that they lacked the requisite intent to create a joint work. *Id.* The Court held that the *Childress* subjective standard did not apply. *Id* at 1228.  It accepted the plaintiff's argument that the heightened *Childress* test only applied when the copyright claimant did not occupy a traditional authorship role as contemplated by Congress. *Id.*  As Congress had contemplated a music producer/performer joint authorship the test was an objective factual standard; to determine whether the plaintiff had engaged in the activities of a producer as set forth in the Legislative History. *Id.*

Other Courts have also relied upon the traditional collaboration relationship of producer/performer.

In *Staggers v. Real Authentic Sound*, 77 F. Supp. 2d 57 (D.D.C. 1999) Plaintiff claimed to be the owner of sound recordings because he "wrote arranged and performed the musical compositions and delivered the master tape to [the

.

producer].'' *Id* at 59. He alleged that the defendant-record label infringed his copyrights by releasing the sound recordings without his authorization. *Id* at 61. The defendant asserted and sought summary judgment on its defense that through the producer it owned the copyrights in the sound recordings. *Id.* Citing to both the Compendium and Nimmer the Court found that the producer could be a co-author depending upon the nature of his role in the creation of the sound recordings. *Id* at 63. The Court denied summary judgment finding there was an issue of fact as to whether the producer made creative contributions to the sound recordings. *Id.*

Another case is *Mapp v. UMG Recordings, Inc.*, 208 F. Supp. 3d 776 (M.D. La. 2016). It involved a claim by the producer of a sound recording for copyright infringement against the distributor of the sound recording. *Id* at 781. Plaintiff had previously judicially terminated his producer agreement with the record label and performer for nonpayment of required advances and royalties. *Id.* In seeking dismissal the defendant-distributor argued that the performer was a joint author of the sound recordings and had licensed the sound recordings to it. *Id* at 785. The Court dismissed plaintiff's claim for infringement holding that while the producer agreement had been terminated it was evidentiary and estabished there was an intent to create a joint work between the producer and the performer. *Id* at 787.

-31-

Referencing industry standards and citing to *Morrill v. Smashing Pumpkins supra* it stated "jurisprudence suggests these standards presume producers and editors are to be regarded as joint authors". *Id* at 787.

Given the traditional collaboration relationship of producer/performer between Mathieson and Basil, and Matheson's performance of the typical duties and functions of a producer as found by the District Court, Mathieson is a co-author of the DSR's.

## D. No Showing Was Made that the Audience Appeal of the DSR's Stems Solely or Primarily From the Performance by Basil

As set forth *supra* at pp. 16-17, in the absence of a showing that the audience appeal of the DSR's was driven solely or primarly by Basil it is assumed that the audience appeal is driven by the copyrightable contributions of Basil, Mathieson and others. No such showing was made by Basil at trial.

## POINT II

## ONLY 50% OF THE COPYRIGHTS IN THE DSR's HAVE REVERTED TO BASIL

Upon the termination of a copyright transfer pursuant to 17 U.S.C. § 203 the grantor only receives back what she transferred; her undivided interest in the whole. *Scorpio Music S.A. v. Willis*, 2012 WL 1598043 at *5 (July 7, 2012 SD Cal). 17

-32-

.

U.S.C. §203(b) provides that on the effective date of termination "all rights under this title that were covered by the terminated grant revert to the author….".

Absent a different agreement among the joint authors they share equally in the ownership of the joint work, even if their respective contributions were not equal. *Id*; *Pye v. Mitchell*, 574 F.2d 476, 480 (9th Cir. 1978); *Erickson v. Trinity Theater, Inc*., 13 F.3d 1061, 1068 (7th Cir. 1994) ("… joint authors hold undivided interests in the work, despite any differences in each author's contribution"). Upon termination an author receives back her pro rata share of the copyright. *Scorpio Music supra* at *5. Where there are three joint authors, and one seeks to terminate, the terminating author receives back a one-third undivided copyright interest. *Id.*

Here, the 50% co-authorship interest of Mathieson in the DSR's, currently held by Stillwater, does not revert to Basil. Both Basil and Stillwater holds a 50% interest in the sound recording copyrights of the DSR's.

## CONCLUSION

The Court should modify the Findings of Fact and Conclusions of Law to provide that on Stillwater's first claim only 50% of the copyrights in the DSR's

-33-

revert to Basil. It should remand the matter for entry of a new judgment in the

amount of 50% of that previously awarded, or $48,347.50, together with such other

and further relief as the Court deems appropriate.

Dated: July 19, 2021

/s/ Anthony Motta
ANTHONY MOTTA
*Attorney for Plaintiff-Counter-*
*Claim-Defendant-Appellant*
64 Fulton Street, # 305
New York, N.Y. 10038
Telephone: (914) 589-5356
Facsimile: (332) 777-1875
E-mail: amotta@anthonymotta.com

.

# CERTIFICATE OF
# COMPLIANCE WITH TYPE-
# VOLUME LIMIT

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) and Local Rule 32-1 because:

This brief contains 7,154 words, excluding the parts of the brief exempted
by Fed. R. App. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in proportionally-space typeface in Times New
Roman, Font Size 14

Dated: July 19, 2021

/s/Anthony Motta
Anthony Motta

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2021, I electronically filed the foregoing Brief for Plaintiff-Counter-Claim-Defendant-Appellant with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All of the participants in this case are registered CM/ECF users, and will be served by the appellate CM/ECF system.


Dated: July 19, 2021


/s/ Anthony Motta