Nos. 21-55241

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

STILLWATER LTD, a United Kingdom Company,
*Plaintiff—Counter-Claim-Defendant—Appellant,*

*v.*

ANTONIA BASILOTTA,
*Defendant—Counter-Claimant—Appellee.*

---

## DEFENDANT-COUNTERCLAIMANT-APPELLEE'S SUPPLEMENTAL
## EXCERPTS OF RECORD

---

On Appeal From The United States District Court For The
Central District of California, Los Angeles
Case No. 2:16-cv-01895-SK
Honorable Steve Kim

---

Mark S. Lee
Rimon, P.C.
2029 Century Park East, Suite 400N
Los Angeles, CA 90067
(310) 361-5776

*Attorneys for Defendant-Counterclaimant-Appellee*
Antonia Basilotta

**DEFENDANT-COUNTERCLAIMANT-APPELLEE'S SUPPLEMENTAL EXCERPTS OF RECORD**

**Table of Contents and Chronological Index**

| Dkt. No. | Description | Page Nos. |
|---|---|---|
| 1 | Complaint for Declaratory Relief | SER-003-022 |
| | Volume I Transcript of Trial Before the Honorable Steve Kim United States Magistrate Judge | SER-023-034 |
| | | |

1  FRANK GOOCH III (Bar No. 70996)
   *fgooch@gilchristrutter.com*
2  GILCHRIST & RUTTER
3  Professional Corporation
   1299 Ocean Avenue, Suite 900
4  Santa Monica, California 90401-1000
5  Telephone: (310) 393-4000
   Facsimile: (310) 394-4700
6
7  ANTHONY MOTTA (Seeking
   admission *pro hac vice*)
8     *tony@mottakrents.com*
   50 Broadway, Suite 800
9  New York, NY 10004
   Telephone: (212) 791-7360
10 Facsimile: (212) 791-7468
11
   Attorneys for Plaintiff Stillwater, Ltd.,
12 a United Kingdom Company
13
            UNITED STATES DISTRICT COURT
14
      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
15
16
17 STILLWATER LTD., a United        Case No.  2:16-cv-1895
   Kingdom Company,
18                                  **COMPLAINT FOR
                  Plaintiff,        DECLARATORY RELIEF**
19
20      v.
21
   ANTONIA BASILOTTA, p/k/a TONI
22 BASIL, an individual,
23                Defendant.
24
25      Plaintiff, STILLWATER LTD., alleges the following as its Complaint against
26 the Defendant, ANTONIA BASILOTTA, p/k/a TONI BASIL:
27      1.      This is an action seeking a declaration that a Notice of Termination –
28 Reversion of Copyright, dated March 20, 2013 (the "Notice"), served and filed by

[465223.1/5123.002]

LAW OFFICES
**GILCHRIST & RUTTER**
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

1  the Defendant, Antonia Basilotta p/k/a Toni Basil ("Defendant" or "Basil"), is

2  ineffective under 17 U.S.C. §203 to cause a reversion of the U.S. Copyrights

3  currently held by the Plaintiff, Stillwater Ltd., ("Plaintiff" or "Stillwater"), in the

4  sound recording entitled "Mickey", derivative versions of "Mickey", and the U.S.

5  copyright held by a third party in a compilation album embodying "Mickey". (A

6  copy of the Notice is attached as Exhibit "1.") (The copyright in the sound recording

7  of "Mickey", including the registered copyrights set forth below, shall be referred to

8  hereafter as the "U.S. Copyrights").

9       2.     "Mickey" was featured in a ground breaking and now iconic

10 audiovisual work choreographed by Defendant (the "Mickey Music Video") and

11 heavily broadcast by the music channel, MTV, starting in 1982.  In addition to

12 providing choreography, Defendant was the featured performer on the Mickey

13 Music Video and provided the vocals to "Mickey" under a written "work for hire"

14 agreement dated August 8, 1982.

15      3.     The Notice seeks a reversion of the copyrights in "Mickey" set forth in

16 the following copyright registrations:

17          a.     Copyright bearing Registration #SR0000041440 as to the sound

18 recordings entitled "Mickey" and "Thief On The Loose", with the Copyright

19 Claimant set forth as Radialchoice Ltd., and Authorship on Application as

20 "Radialchoice, employer for hire of Toni Basil."  The registration sets forth the

21 "Date of Publication" as August 13, 1982 (the "Mickey Copyright").

22          b.     Copyright bearing Registration #SR0000038729 in the album

23 entitled, *Word of Mouth*, which embodied a number of sound recordings including

24 the sound recording, "Mickey", with the Copyright Claimant set forth as

25 Radialchoice Ltd., and Authorship on Application as "Radialchoice, employer for

26 hire of Toni Basil." The registration sets forth the "Date of Publication" as

27 September 17, 1982 (the "*Word of Mouth* Copyright").

28          c.     A "derivative copyright" in the sound recording, "Mickey, a

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

1   special club mix" ("Mickey Club Mix") bearing Registration # SR0000041392, with

2   the Copyright Claimant set forth as Radialchoice Ltd., and Authorship on

3   Application as "Radialchoice, employer for hire of Toni Basil."  The registration

4   sets forth the "Date of Publication" as December 3, 1982 (the "Mickey Club Mix

5   Copyright").

6          d.     A "derivative copyright" in the sound recording, "Mickey, a

7   Spanish Version" ("Mickey Spanish Version") bearing Registration

8   #SR0000041439, with the Copyright Claimant set forth as Radialchoice Ltd., and

9   Authorship on Application as "Radialchoice, employer for hire of Toni Basil."  The

10  registration sets forth the "Date of Publication" as December 3, 1982 (the "Mickey

11  Spanish Version Copyright").

12         e.     Copyright bearing Registration #SR00000618344, with the

13  copyright claimant as Razor & Tie Direct, LLC, for the compilation album, *The Best

14  of Toni Basil: Mickey and Other Love Songs*.  The registration sets forth the "Date

15  of Publication" as September 27, 1994 (the "Razor & Tie Copyright").

16    4.     The Notice also attempts to "terminate" the assignments leading to

17  Stillwater's ownership of the U.S. Copyrights in "Mickey", and other sound

18  recordings, recorded on December 8, 2011 bearing document number V3611D532

19  (the "Assignment").

20    5.     As alleged in further detail below, the Notice is ineffective, in part,

21  because (i) "Mickey" was created as an audiovisual work pursuant to a "work for

22  hire" contractual provision and is therefore not subject to reversion; (ii) "Mickey, a

23  special club mix" and "Mickey, a Spanish Version" are derivative works of

24  "Mickey" and therefore not subject to reversion; (iii) Razor & Tie Direct, LLC used

25  "Mickey" pursuant to license given by predecessor to Plaintiff which is not subject

26  to termination, and in any event, the copyright claimed by Razor & Tie Direct, LLC,

27  is in the compilation itself and not in the individual sound recordings embodied on

28  the compilation; and (iv) the date for reversion is premature as it is less than thirty-

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

1 | five (35) years from the first publication of "Mickey" as set forth in the Mickey
2 | Copyright.

3 | **THE PARTIES**

4 | 6.     Stillwater is a limited company organized under the laws of the United
5 | Kingdom having its principal place of business in London, England.  Stillwater is in
6 | the business of licensing and otherwise exploiting throughout the World copyrights
7 | it holds in musical sound recordings and the musical compositions embodied in such
8 | sound recordings.

9 | 7.     Stillwater currently holds the U.S. Copyrights as a result of a series of
10 | assignments and transfers from the original copyright claimant, Radialchoice Ltd.
11 | ("Radialchoice"), recorded with the U.S. Copyright Office under Document
12 | #V3611D532.

13 | 8.     Upon information and belief, Basil is a citizen of the State of
14 | California, resident in Los Angeles, California.

15 | 9.     Upon information and belief, Defendant was and is a musical
16 | performer, singer and choreographer.

17 | **JURISDICTION**

18 | 10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§
19 | 1331 and 1338(a) as this is an action brought under the Copyright Act and the
20 | Copyright Revision Act, 17 U.S.C. § 101, *et seq*.  The Court is empowered to issue
21 | the declaratory relief sought by Plaintiff pursuant to 28 U.S.C. § 2201(a).

22 | **VENUE**

23 | 11.     Venue of this case is proper in this district pursuant to 28 U.S.C.
24 | §1391(b)(1) as, upon information and belief, Defendant is resident in the State of
25 | California and the Central District of California.

26 | **BACKGROUND**

27 | 12.     Radialchoice, the original owner of the U.S. Copyrights, was organized
28 | under the laws of the United Kingdom in 1978.   It was an independent record label

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

1    whose business was to find, develop, record, and promote visually literate recording

2    and performance artists who were marketed and promoted in large part through the

3    early use of audiovisual works called "music videos".

4         13.    In or about 1979 Radialchoice selected Defendant as a choreographer,

5    musical performer, and singer to be featured in one of its first music videos.

6    "Mickey" was initially conceived as a music video as part of the business model of

7    Radialchoice.  Defendant's talents and experience were seen as ideal for the

8    production of the Mickey Music Video.

9         14.    On or about August 31, 1979 Radialchoice entered into an exclusive

10   artist recording agreement with Defendant (the "1979 Agreement") under which

11   Radialchoice financed the creation of master recordings of three musical

12   compositions, to be released as a "single," including "Mickey."  Pursuant to the

13   1979 Agreement Defendant agreed:

14        a.    To provide vocals rendering "her services to the best of her skill

15   and ability in recording three (3) Titles…"

16        b.    "[A]ll master recordings hereunder shall be and remain the

17   property of the Company for perpetuity."

18        c.    It "and any and all extensions and/or modifications thereof shall

19   be governed by the laws of England."

20        15.    The 1979 Agreement was subsequently amended by an agreement

21   dated October 1, 1980 ("The 1980 Amendment").  Pursuant to the 1980

22   Amendment, Defendant:

23        a.    Recorded additional master recordings which were to be released

24   as part of a "long playing record," subsequently named *Word of Mouth*.

25        b.    Acknowledged that Radialchoice had financed and produced an

26   audiovisual recording of Defendant's performances.

27        c.    Agreed in an "Amending Document" forming part of the 1980

28   Amendment that upon request Defendant was to render her services for the

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

1   production of further audiovisual recordings embodying the masters

2     16. Radialchoice entered into the 1980 Amendment with the intent of

3   releasing an album comprised of music videos of each of the sound recordings of

4   *Word of Mouth*. The Mickey Music Video was produced in or about 1980 by

5   Radialchoice, who hired musicians to accompany Defendant's vocals.

6     17. "Mickey" was originally released in the United Kingdom in 1981 as a

7   single in vinyl and cassette format without any appreciable sales or success.  The

8   only contribution by Defendant to "Mickey" was the vocals. Radialchoice retained a

9   music producer and the supporting musicians.

10     18. Initially, there was no substantive sub-licensing interest in "Mickey" in

11   the United Kingdom or elsewhere.  Thereafter, Radialchoice entered into a record

12   distribution and license agreement, on or about March 9, 1982, with Virgin Records

13   Limited ("Virgin") for *Word of Mouth*.

14     19. A short time thereafter, as a direct result of viewing the Mickey Music

15   Video, Radialchoice convinced the British Broadcasting Company ("BBC") to

16   produce a television special featuring Defendant.  Radialchoice then re-released

17   "Mickey" to coincide with the national broadcast of the television special.  As a

18   result, "Mickey" reached the No. 2 position on the United Kingdom "Singles

19   Chart."

20     20. Thereafter, Virgin and Radialchoice were able to negotiate multiple

21   international sub-licenses for the album and the video album featuring Basil.  The

22   album and video album were released in vinyl, cassette and video cassette (VHS and

23   Betamax) formats.

24     21. Following the success of the  Mickey Music Video and "Mickey",

25   Defendant attempted to terminate her services with Radialchoice.  As a result the

26   1979 Agreement was re-negotiated and on or about August 8, 1982 Radialchoice

27   and Defendant entered into a new Exclusive Recording and Audio Visual Artiste

28   Agreement (the "1982 Agreement").  The 1982 Agreement provided, in relevant

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

1  part, as follows:

2      a.      Any master recording, defined as any sound master and

3  audiovisual master, made under the agreement or during its term would be

4  considered a "work for hire".

5      b.      The agreement "…contains the full and complete understanding

6  between the parties and supersedes, nullifies, and replaces all prior agreements and

7  understandings, whether written or oral, pertaining thereto…" provided that the

8  clause would not release the parties from the respective warranties and obligations

9  in respect of *Word of Mouth,* or affect the rights granted to Radialchoice by the 1979

10  Agreement and 1980 Amendment, or affect any of Defendant's rights to object to

11  statements or audit books and records given under the 1979 Agreement and 1980

12  Amendment.

13      22.     "Mickey" was released as a single in the United States on or about

14  August 13, 1982, shortly after the date of the 1982 Agreement, and at a time the

15  Mickey Music Video was receiving heavy rotation on the MTV Music channel.  As

16  a direct result of the heavy exposure on MTV, "Mickey" reached No. 1 on the

17  *Billboard* Hot 100 in the United States , and the Mickey Music Video attained the

18  iconic status it holds today.

19  **PRIOR PROCEEDINGS BETWEEN**

20  **THE PARTIES CONCERNING "MICKEY"**

21      23.     This is the third action brought in the Federal Courts of New York and

22  California concerning Defendant's alleged rights in "Mickey."

23      24.     On August 18, 2011 Defendant brought an "in rem action" in the U.S.

24  District Court for the Southern District of New York, assigned File No. 11 Civ.

25  5757, against the physical master recordings of "Mickey" held by Razor & Tie in

26  New York City.  Relying upon the 1982 Agreement Defendant sought a declaration

27  that she held title to both the physical master recordings and the sound recording

28  copyright in "Mickey".

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

25.     Stillwater, as the owner of the copyright in "Mickey", moved to intervene and sought dismissal based upon lack of subject matter jurisdiction, lack of in rem jurisdiction, lapse of the statute of limitations, and improper venue. The court dismissed the action for lack of subject matter jurisdiction by decision dated March 15, 2012.

26.     On June 14, 2012 Defendant commenced a second action in the U.S. District Court for the Central District of California against Stillwater and others, under File No. CV 12-05186, again claiming rights in "Mickey".  Defendant's claim was again premised on the 1982 Agreement. Plaintiff's motion to dismiss, premised in part for failure to state a cause of action, was granted by decision and order dated February 20, 2013, with leave given to Plaintiff to file an amended complaint.

27.     Defendant filed an amended complaint and for the first time alleged that the rights in "Mickey" were governed by the 1979 Agreement.  When Plaintiff noted the deficiencies of the amended complaint, Defendant, on March 20, 2013, filed a Second Amended Complaint (the "SAC").  On March 20, 2013 Defendant also served the Notice.  Plaintiff again moved to dismiss on multiple grounds, including failure to state a claim.  Rather than oppose the motion to dismiss Defendant voluntarily and unilaterally discontinued the action on May 2,, 2013.

## DISPUTE OVER THE EFFICACY OF
## THE NOTICE UNDER 17 U.S.C. §203

28.     By letter dated March 6, 2015 from Plaintiff's attorney, Anthony Motta ("Motta"), to Defendant's attorney, F. Edie Mermelstein ("Mermelstein"), Plaintiff advised Defendant that the Notice was ineffective to cause a reversion of the Mickey Copyright, the *Word Of Mouth* Copyright, the Mickey Club Mix Copyright, the Mickey Spanish Version Copyright, and the Razor & Tie Copyright. In the letter Plaintiff set forth its reasons why the Notice was ineffective.

29.     By responsive letter dated May 6, 2015 from Mermelstein to Motta, Defendant denied without elaboration that the Notice was ineffective.

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000  •  FAX (310) 394-4700

30.     There exists an actual controversy between Plaintiff and Defendant as whether the Notice is effective under 17 U.S.C. §203 to cause a reversion of the Mickey Copyright, the *Word Of Mouth* Copyright, the Mickey Club Mix Copyright, the Mickey Spanish Version Copyright, and the Razor & Tie Copyright, and as to the efficacy of the Assignment. This Court is empowered to issue a declaratory judgment declaring the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201(a).

### FIRST CLAIM FOR DECLARATORY JUDGMENT
### THAT THERE IS NO REVERSION OF THE MICKEY
### COPYRIGHT AND THE *WORD OF MOUTH* COPYRIGHT

31.     As set forth in the Notice, a reversion of the *Word Of Mouth* Copyright is also only sought as to "Mickey", and not as to any of the other sound recordings embodied on *Word Of Mouth*, or as to the configuration and compilation of the sound recordings embodied on *Word Of Mouth*.

32.     The 1982 Agreement by its explicit terms supersedes the 1979 Agreement as to the rights of Defendant in "Mickey".

33.     Pursuant to the 1982 Agreement Defendant's vocals in "Mickey" were specially commissioned for use as a contribution to an audiovisual work under a provision stating that it was made as a "work for hire", thus satisfying the requirements for a "work for hire" under 17 U.S.C. §101.

34.     As a work for hire, "Mickey" does not fall within the ambit of the right of reversion under 17 U.S.C. §203(a).

35.     In addition, the Notice is ineffective to cause a reversion of the Mickey Copyright and the *Word Of Mouth* Copyright for the following reasons:

        a.     The stated date for termination is premature. The Notice purports to affect a termination thirty-five years from the date of initial publication of "Mickey".  As set forth in the Mickey Copyright, the date of first publication is August 13, 1982.  The earliest the Notice can be effective is August 13, 2017. The

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

1    Notice sets forth June 11, 2016 as the effective date of reversion.

2          b.    Any claim by Defendant that Mickey is not a work for hire is

3    time barred by the three-year statute of limitations set forth in 17 U.S.C. §507.  The

4    Mickey Copyright and *Word Of Mouth* Copyright provide public notice to

5    Defendant that Plaintiff's predecessor and copyright owner, Radialchoice, was the

6    author as a work for hire from Defendant. Moreover, in the prior litigation involving

7    Defendant, occurring more than three years ago, Defendant relied upon the 1982

8    Agreement, containing the work for hire provision, as the source of her rights and

9    therefore aware of the provision as a source of Plaintiff's rights in "Mickey."

10          36.    Even if the right of reversion were applicable, which it is not,

11   Defendant's grant under the 1979 Agreement, the 1980 Amendment, and the 1982

12   Agreement was only as to her vocal performance and therefore the reversion would

13   only apply to that grant, and not the remainder of the musical performances in

14   "Mickey" by the musicians hired by Radialchoice.

15          37.    Plaintiff is entitled to a declaratory judgment that the Notice is

16   ineffective to cause a reversion, and there is no reversion, of the Mickey Copyright

17   and the *Word Of Mouth* Copyright, or in the alternative, to a declaratory judgment

18   that the reversion is only effective as to the vocal performance of Defendant and to

19   no other portion of the sound recording of "Mickey".

20          **SECOND CLAIM FOR DECLARATORY JUDGMENT**

21   **THAT THERE IS NO REVERSION OF THE MICKEY CLUB MIX**

22   **COPYRIGHT AND THE MICKEY SPANISH VERSION COPYRIGHT**

23          38.    Plaintiff repeats the allegations set forth in paragraphs 1 through 37.

24          39.    As set forth in the Notice itself, the Mickey Club Mix and the Mickey

25   Spanish Version are derivative versions of "Mickey".

26          40.    Pursuant to 17 U.S.C. §203(b)(1) a derivative work may continue to be

27   utilized notwithstanding any termination and reversion of the copyright in the

28   original work, and the copyright in the derivative work does not terminate or revert.

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

41.     Even assuming the Notice is effective as to the Mickey Copyright, the Mickey Club Mix Copyright and Mickey Spanish Version Copyright as derivative works do not terminate or revert as a result of the Notice.

42.     In addition, the Notice is ineffective to cause a reversion of the Mickey Club Mix Copyright and Mickey Spanish Version Copyright for the following reasons:

a.     The stated date for termination is premature. The Notice purports to affect a termination thirty-five years from the date of initial publication of "Mickey".  As set forth in both the Mickey Special Club Mix Copyright and Mickey Spanish Version Copyright, the date of first publication for both is December 3, 1982.  The earliest the Notice can be effective is December 3, 2017. The Notice sets forth June 11, 2016 as the effective date of reversion.

b.     Any claim by Defendant that Mickey is not a work for hire is time barred by the three-year statute of limitations set forth in 17 U.S.C. §507.  The Mickey Special Club Mix Copyright and Mickey Spanish Version Copyright provide public notice to Defendant that Plaintiff's predecessor and copyright owner, Radialchoice, was the author as a work for hire from Defendant. Moreover, in the prior litigation involving Defendant, occurring more than three years ago, Defendant relied upon the 1982 Agreement as the source of her rights and was therefore aware of the provision as the source of Plaintiff's rights in "Mickey".

43.     Even if the right of reversion were applicable, which it is not, Defendant's grant under the 1979 Agreement, 1980 Amendment, and the 1982 Agreement was only as to her vocal performance and therefore the reversion would only apply to that grant,  and not the remainder of the musical performances in the Mickey Club Mix and the Mickey Spanish Version by the musicians hired by Radialchoice.

44.     Plaintiff is entitled to a declaratory judgment that the Notice is ineffective to cause a reversion, and there is no reversion, of the Mickey Club Mix

1   Copyright and Mickey Spanish Version Copyright, or in the alternative, to a

2   declaratory judgment that the reversion is only effective as to the vocal performance

3   of Defendant and to no other portion of the sound recording of Mickey Club Mix

4   and the Mickey Spanish Version.

5   **THIRD CLAIM FOR DECLARATORY JUDGMENT**

6   **THAT THERE IS NO REVERSION OF THE RAZOR & TIE COPYRIGHT**

7   **AND THE NOTICE DOES NOT AFFECT THE EFFICACY OF THE**

8   **ASSIGNMENT**

9       45.    Plaintiff repeats the allegations set forth in paragraphs 1 through 44.

10       46.    The Notice is ineffective as to the Razor & Tie Copyright as the use of

11   "Mickey" by Razor & Tie LLC was pursuant to license, and the right of reversion

12   under 17 U.S.C. §203 does not affect licenses given prior to any copyright

13   reversion.

14       47.    Moreover, the Razor & Tie Copyright is as to the compilation of sound

15   recordings embodied on the album, *The Best of Toni Basil: Mickey and Other Love*

16   *Songs,* and not as to the sound recording of "Mickey" itself.

17       48.    The Assignment merely transfers rights in a number of sound

18   recordings, including "Mickey".  The Notice has no effect as the rights transferred

19   in the sound recordings under the Assignment, and does not operate to invalidate the

20   Assignment.

21       49.    Plaintiff is entitled to a declaratory judgment that the Notice is

22   ineffective to cause a reversion, and there is no reversion, of the Razor & Tie

23   Copyright, and the Notice has no effect on the validity of the Assignment.

24       WHEREFORE, Plaintiff, Stillwater Ltd., prays for relief against the

25   defendant, Antonia Basilotta p/k/a Toni Basil as follows:

26       1.    On Plaintiff's First Claim for a declaratory judgment that the Notice is

27   ineffective to cause a reversion, and there is no reversion, of the Mickey Copyright

28   and the *Word Of Mouth* Copyright, or in the alternative, to a declaratory judgment

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

**SER-014**

1 │ that the reversion is only effective as to the vocal performance of Defendant and to

2 │ no other portion of the sound recording of "Mickey".

3 │     2.    On Plaintiff's Second Claim for a declaratory judgment that the Notice

4 │ is ineffective to cause a reversion, and there is no reversion, of the Mickey Club Mix

5 │ Copyright and Mickey Spanish Version Copyright, or in the alternative, to a

6 │ declaratory judgment that the reversion is only effective as to the vocal performance

7 │ of Defendant and to no other portion of the sound recording of Mickey Club Mix

8 │ and the Mickey Spanish Version.

9 │     3.    On Plaintiff's Third Claim for a declaratory judgment that the Notice is

10 │ ineffective to cause a reversion, and there is no reversion, of the Razor & Tie

11 │ Copyright, and the Notice has no effect on the validity of the Assignment.

12 │     4.    For the costs of this suit and Plaintiff's reasonable attorney's fees

13 │ incurred in prosecuting this action.

14 │     5.    For any other and additional relief as is just and proper.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

1   DATED:  March 18, 2016       GILCHRIST & RUTTER
2                                A Professional Corporation

3                                    and

4                                ANTHONY MOTTA

5

6

7                        By:  _____

8                                FRANK GOOCH III
                                 *fgooch@gilchristrutter.com*
9

10                               ANTHONY MOTTA
                                 (Seeking Admission *pro hac vice*)
11                               *tony@mottakrents.com*

12
                                 Attorneys for Plaintiff
13                               Stillwater Ltd., a United Kingdom Company

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
GILCHRIST & RUTTER
PROFESSIONAL CORPORATION
1299 OCEAN AVENUE, SUITE 900
SANTA MONICA, CALIFORNIA 90401-1000
TEL (310) 393-4000 • FAX (310) 394-4700

SER-016

# EXHIBIT "1"

(18 of 34)



THE OFFICES OF F. EDIE MERMELSTEIN
*Attorney at Law*

MEMBER, CALIFORNIA STATE BAR
EDIE@FEMLAWYERS.COM

18811 HUNTINGTON ST., SUITE 240
HUNTINGTON BEACH, CA 92648

714.596.0137
714.841.8810 (FAX)

*SENT VIA FIRST CLASS MAIL*

March 20, 2013

Copyright Office Notices of Termination
P.O. Box 71537
Washington, DC 20024-1537

## NOTICE OF TERMINATION-REVERSION OF COPYRIGHT
### 17 U.S.C.A. § 203

This office represents performer **Antonia Basilotta p/k/a Toni Basil ("Author")**. Notice is hereby given to the entities and natural persons named on the service list, attached hereto and incorporated by this reference, of Author's election of termination and reversion of copyright under **§ 203** of the Copyright Act, with respect to the following sound recording: *Mickey*. Termination hereunder shall be effective as of **June 11, 2016**.

Section 203 of the Copyright Act provides:

> "In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination" 17 U.S.C.A. § 203(a)

| | |
|---|---|
| Effective Date of Termination: | **June 11, 2016** |
| Date Execution of Original Grant: | August 31, 1979 |
| Date Work Created: | 1980 |
| Date Publication: | June 11, 1981 |
| Title of Work: | ***Mickey*** |
| Copyright Registration#: | SR0000041440 |
| | SR0000038729 |
| | SR0000041392 |
| | SR0000041439 |
| | SR0000618344 |
| | V3611D532 |
| Name of Author Granting Rights: | Antonia Basilotta p/k/a Toni Basil |

Effective Date of Termination calculated as thirty-five years from the date of publication of the Work, which occurred at least as early as June 11, 1981. Termination can occur at any time during a five-year period that begins at the end of thirty-five years from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant, whichever term ends earlier. 17 U.S.C.A. §203(a)(3).

<u>Brief Statement Reasonably Identifying The Grant To Which The Notice Of Termination Applies</u>

Author, an United States citizen and resident of Los Angeles, California, and Radialchoice, Ltd., negotiated and executed a written recording agreement dated August 31, 1979 in Los Angeles, California, which constituted an exclusive grant of rights (the "Agreement"). Pursuant to the Agreement, Author performed and recorded the Work, *Mickey*, at Cherokee Studios in Los Angeles, California. Nationals and persons domiciled are entitled to protection of U.S. Copyright laws. 17 U.S.C.A. §104(b)(1)

The Work was not a work made for hire. Author was not an employee of Radialchoice, the parties did not expressly agree in a written instrument signed by them that the work shall be considered a work made for hire, and a sound recording is not among the nine categories for which a specially commissioned work may be considered a work made for hire. 17 U.S.C.A. §101

The Work was published at least as early as June 11, 1981, when it was marketed and sold to the public in the United Kingdom.

<u>Copyrights Issued In The Sound Recording</u>

1)      Copyright in the **sound recording** was registered in the U.S. Copyright Office (reg. #SR0000041440) for the single with the songs *Mickey* and *Thief On The Loose*. The copyright claimant is Radialchoice, Ltd.

2)      Copyright in the **sound recording** was registered in the U.S. Copyright Office (reg. #SR0000038729) for the LP issued in the United States, with the songs *Mickey* and *Thief On The Loose*, as well as *Rock On, Shoppin' A to Z, You Gotta Problem, Be Stiff, Nobody, Little Red Book, Space Girls* and *Time After Time*. The copyright claimant is Radialchoice, Ltd.

3)      A derivative copyright in the **sound recording** was registered in the U.S. Copyright Office (reg. # SR0000041392) for *Mickey, a special club mix*. The copyright claimant is Radialchoice, Ltd.

4)      A derivative copyright in the **sound recording** was registered in the U.S. Copyright Office (reg. # SR0000041439) for *Mickey, a Spanish version*. The copyright claimant is Radialchoice, Ltd.

5)      A copyright in the **sound recording** was registered in the U.S. Copyright Office (reg. # SR0000618344) for the compilation album *The Best of Toni Basil: Mickey and Other Love Songs*, which included *Mickey*. The copyright claimant is Razor & Tie Direct, LLC.

6)      A recorded document was registered in the U.S. Copyright Office (reg. #V3611D532) under the title "Mickey & 43 other titles." The copyright claimants are Stillwater, Ltd., Twist and Shout, Ltd., and Odel Finance Corporation.

Contact Information
We are authorized agents for Antonia Basilotta aka Toni Basil.  For additional information, contact our
office at:

      Law Offices of F. Edie Mermelstein
      18811 Huntington Street, Suite 240
      Huntington Beach, CA 92648
      (714) 596-0137
      (714) 841-8810 fax

To the best knowledge and belief of the person signing the notice, the notice has been signed by all
persons whose signature is necessary to terminate the grant under section 203 of title 17, U.S.C.A., or by
their duly authorized agents.


F. Edie Mermelstein
Attorney and duly authorized agent for Antonia Basilotta p/k/a Toni Basil

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 18811 Huntington Street, Suite 240, Huntington Beach, CA 92648.

On March 20, 2013, I served the foregoing documents described as **NOTICE OF TERMINATION—REVERSION OF COPYRIGHT** on interested parties in this action by sending a true copy of the document to the following parties:

*[See attached service list]*

☒     **BY REGULAR MAIL:**  I deposited such envelope in the mail in Huntington Beach, California.  The envelope was mailed with postage thereon fully prepaid.

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☐     **STATE:**  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☒     **FEDERAL:**  I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 20, 2013 at Huntington Beach, California.

Annie Lu

## SERVICE LIST

| | |
|---|---|
| Radialchoice Ltd. (*company dissolved-no address*) | Ultratape Ltd (*company dissolved-no address*) |
| Alarum Ltd. (*company dissolved-no address*) | Odel Licensing Ltd. (*company dissolved*)<br>8 Prospect Hill<br>Douglas<br>IM1 1EJ<br>Isle of Man |
| Simon Peter Lait<br>Pilton Road, The Old Rectory<br>Glebe Court, Wadenhoe<br>Northhampshire PE85SY<br>United Kingdom | Odel Finance Corporation<br>c/o Ickham Court<br>Ickham<br>Kent<br>CT3 1WQ |
| Roy Clifford Tucker<br>Nettlestead Place<br>Maidstone<br>Kent<br>ME18 5HA | Twist and Shout Ltd.<br>21 A Maury Rd<br>Stoke Newington<br>London<br>N16 7BP |
| Stillwater Ltd.<br>21a Maury Road<br>Hackney, London<br>N16 7BP<br>United Kingdom | Razor & Tie Music, L.P.<br>214 Sullivan Street #4A<br>New York, New York, 10012 |
| Razor & Tie Entertainment, L.L.C.<br>214 Sullivan Street #4A<br>New York, New York, 10012 | Razor & Tie Direct, L.L.C.<br>214 Sullivan Street #4A<br>New York, New York, 10012 |
| Chrysalis Records Limited<br>27 Wrights Lane<br>London<br>W8 5SW | Warner Music Group<br>Los Angeles Office<br>3400 W Olive Ave<br>Burbank, CA 91505 |
| BMG Rights Management<br>SpreePalais<br>Anna-Louisa-Karsch-Str. 2<br>10178 Berlin | BMG Chrysalis<br>Los Angeles Office<br>6100 Wilshire Boulevard, Suite #1600<br>Los Angeles, CA 90048 |
| Sony Music Entertainment<br>10635 Santa Monica Blvd # 300<br>Los Angeles, CA 90025 | |

1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
2          WESTERN DIVISION – LOS ANGELES

3

4  STILLWATER LTD.,            )   Case No. CV 16-1895-SK
                               )
5       Plaintiff,             )   Los Angeles, California
                               )   Monday, December 9, 2019
6            v.                )
                               )
7  ANTONIA BASILOTTA,          )
                               )
8       Defendant.             )
   _____)
9

10

11                       VOLUME I
                    TRANSCRIPT OF TRIAL
12            BEFORE THE HONORABLE STEVE KIM
              UNITED STATES MAGISTRATE JUDGE.
13

14

Appearances:              See Page 2
15
Deputy Clerk:             Connie Chung
16
Court Reporter:           Recorded; CourtSmart
17
Transcription Service:    JAMS Certified Transcription
18                        16000 Ventura Boulevard #1010
                          Encino, California  91436
19                        (661) 609-4528

20

21

22

23

24

Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

```
 1   APPEARANCES:

 2


 3   For the Plaintiff:      ANTHONY MOTTA
                             64 Fulton Street, Suite 305
 4                           New York, New York  10038
                             (212) 791-7360
 5                           amotta@anthonymotta.com

 6


 7   For the Defendant:      FEM Law Group
                             By:  FREDA E. MERMELSTEIN
 8                           18811 Huntington Street, Suite 240
                             Huntington Beach, California  92648
 9                           (714) 596-0137
                             edie@FEMLawyers.com
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    done.

2           MS. MERMELSTEIN:  Okay

3           THE COURT:  All right?  So --

4           MS. MERMELSTEIN:  I'd like to call Ms. Basil.

5           UNIDENTIFIED SPEAKER: Around here.

6           MS. BASILOTTA:  (Indecipherable) -- not in front?

7    Do you want me to go out behind her?  Oh.

8           THE CLERK:  -- raise your right hand.

9           First, (inaudible) state your full name for the

10   record.

11          MS. BASILOTTA:  It is cold up here.  What?

12          THE CLERK:  Please state your full name for the

13   record.

14          MS. BASILOTTA:  My legal name is

15   Antonia Christina Basilotta.

16     ANTONIA CHRISTINA BASILOTTA, DEFENDANT'S WITNESS, SWORN

17          THE CLERK:  Please be seated.

18          THE WITNESS:  Okay.  Thank you.

19          MS. MERMELSTEIN:  Good afternoon, Ms. Basil.

20          THE WITNESS:  Hello, Counsel.  It's cold up here.

21          THE COURT:  That's funny.  I'm hot.

22          THE WITNESS:  Well, there you go.  Ying and yang.

23   I think I'm tired.

24                        DIRECT EXAMINATION

25   BY MS. MERMELSTEIN:

1    Q    Can you please tell me about your singing career prior

2    to contracting with Radialchoice?

3    A    Well, it started when I first came from Las -- from

4    Las Vegas.  My dad was the orchestra leader at the

5    Sahara Hotel, and I was a head cheerleader over there so --

6    at the -- Las Vegas High.  So, when I came to L.A., I had an

7    enormous amount of dance, singing, musical training, and

8    actually, after my first dancing job, my second job was to

9    play the role of "Anita" in "West Side Story," which is quite

10   a singing role.  Then I started immediately to choreograph

11   with David Winters, who was also one of the original people

12   in "West Side Story."

13           And in '67 I recorded a single for A&M Records

14   called "Breakaway."  The flip side was "I'm 28 and It's

15   Getting Late."  Bruce Conner made a film of it, which still

16   exists in museums and art institutes all over the world.

17   After that, I really started to choreograph and direct a lot.

18   I worked for David Bowie; I was his co-director.  I worked

19   for Bette Midler, Tina Turner, and I put together a group

20   called The Lockers, and we started The Lockers on television

21   and "Saturday Night Live" and opened up for Frank Sinatra at

22   Carnegie Hall.

23   Q    And then did you ever --

24   A    And then I started to -- I'm sorry?

25   Q    Did you ever sing on "Saturday Night Live"?

SER-026

1  A    And that's how -- I did sing on "Saturday Night Live,"

2  but the first time I was on "Saturday Night Live," it was

3  with The Lockers.

4       Then I started -- after The Lockers broke up in

5  seventy -- well, before The Lockers broke up, I started to

6  sing again, and in seventy -- '76 I started to do shows at

7  The Roxy on Sunset Boulevard, which were very successful.  I

8  did one show, and then we had such an overflow of an audience

9  that I came back a couple of weeks later and did two shows,

10 and at that point Mo Ostin and Jerry Weintraub had heard

11 about me, and they brought me over to Weintraub's office, I

12 signed with Weintraub, and I signed with Warner Brother

13 Records.

14      So they brought me back to The Roxy at the -- more

15 at the end of '76.  I did three shows that Jerry Weintraub

16 and Mo Ostin produced, but it was a show I started out with

17 in the first place.  They recorded a live album, and then we

18 did another album, and then I got a television special to do

19 a pilot --

20 Q    And what year was that?

21 A    I think by then it was -- that was '76.  You know, I'm

22 dyslexic.  You know that, Edie.  It was '76, and in '77 I did

23 the pilot.  I also opened up for Don Rickles at the

24 Sahara Hotel.

25 Q    And when you say "opened up," what does that entail?

1  A    Oh, do, you know, like, a 20-minute set before he came

2  on stage.

3  Q    Of singing?  Of dancing?

4  A    Singing -- singing, dancing, and I brought some dancers,

5  also.  Yes.

6         And then after that, I choreographed, also, in

7  between for other people -- for Bette again, for Tina's first

8  time out after she left Ike -- and then I put together

9  another show called "Follies Bazaar."

10 Q    And in "Follies Bazaar" were there any inklings that

11 ended up making it into your "Word of Mouth" album, meaning,

12 any creative components?

13 A    An enormous amount.

14 Q    And what were those creative components?

15 A    Well, I worked with Devo on "Follies Bazaar."  I worked

16 with concepts -- stage concepts of "Venetian Blinds,"

17 "Pink Poodles."  Because there were no wings on the stage but

18 there was a -- you know, a backdrop and a screen, we shot

19 film and footage of silhouettes that I hired Bruce Conner to

20 do, and that was more my set was the silhouettes.  And we

21 think -- I think we had 22 dancers and, like, a ten-piece

22 orchestra.

23 Q    Okay.  So let's move forward.  Do you remember meeting

24 Simon Lait?

25 A    I remember him calling me on the phone.  I remember

1  Dave Storrs saying that this person Simon Lait was going to

2  call me, that he was interested in me conceptualizing a show

3  for an artist that he had.

4  Q    And who was that artist?

5  A    That was Betty Davis.

6  Q    And did you agree to conceptualize a stage show for

7  Betty Davis?

8  A    No.  I told Simon that I had just done a show of my own,

9  that I always -- you know, that -- that I also recorded, and

10 that the people that I worked with that I did conceptualize

11 shows for were more like Tina and David and -- I worked for

12 them a lot.  So I said I'd only be interested in doing

13 something like -- I was interested in continuing to do

14 something like that for myself and --

15 Q    And did you have an intent to do it with anybody else as

16 far as sharing the creative control?

17 A    You mean --

18 Q    Doing -- doing a recording for Radialchoice?

19 A    For Radialchoice?  Well, we hadn't gotten there yet.  I

20 -- he just -- I said I would be interested in doing it

21 myself, and he said, "Would" -- "Well, then would you" --

22 "would you record for me?"

23          And I said, "Well, what would you want me to do?"

24          And he said, "I only need" -- he -- "three songs."

25          And I already knew what the three songs would be.

SER-029

1   I would just pull everything in from the Fox Venice show --

2   images, you know, songs either with Devo or what I had done

3   with Devo previously.  And I of course thought, "Ooh, I'll

4   have product for this next show," because we were going to

5   take the Fox Venice show to see about working with Joe Papp

6   on Broadway, but I thought, "We're going to have three songs;

7   so we have more product."  And I had shot a proscenium of the

8   Fox Venice show that I was going to bring to Joe Papp, and I

9   would have these -- these recorded songs.

10          And then, when I recorded the songs, my contract

11  didn't say anything about doing videos, but Simon asked me if

12  I would do some promotional videos, and I jumped at the

13  chance because I thought it was a great idea.  So I don't

14  know whether he knew that I was going to do three promotional

15  videos.  I recall him giving me a budget, and I think, since

16  I didn't get, really, any -- any sense of what he wanted me

17  to do, I figured he just wanted me to do what I wanted to do.

18  So --

19  Q    Did you ever have to -- well, let's go to the signing of

20  the contract.

21  A    So he never -- but he never -- never asked to hear me

22  sing, and he never asked for a picture of me.

23  Q    Did you ever send him a demo tape?

24  A    I never sent him a demo tape of -- before he signed me?

25  Q    Right.

1    A    No.  I never sent him a -- he never asked for a demo

2    tape before he signed me.

3    Q    And then once you signed, did you specifically retain

4    artistic control?

5    A    When we -- when I signed, I made sure I had artistic

6    control.  Of course.  Because I was doing everything from

7    inspiration from my other -- from -- from my Fox Venice show,

8    and I had just -- he was just starting a label.  So I would

9    not give him artistic control.

10   Q    And --

11   A    He -- I don't think he had -- I didn't know he even had

12   another artist other than Betty Davis, who I'd never heard

13   of.

14   Q    Do you remember starting the recording process?  After

15   --

16   A    With Jerry and Mark?

17   Q    Yes.  With Jerry and Mark.

18   A    Yeah.  Jerry and Mark and I had -- mostly with Jerry --

19   we had meetings about whether we would do the songs -- the

20   exact songs from the Fox Venice show or switch them up

21   because a lot of what we did in the -- what -- what I did in

22   the Fox Venice show was -- it was very theatrical.  So it

23   wasn't exactly what you would make a 45 out of.

24   Q    And what was your intent with Greg and Jerry as far as

25   sharing billing or sharing the --

1  A    Greg and Jerry?

2  Q    Yes.

3  A    Greg Mathieson?

4  Q    Oh, I'm sorry.  Jerry and Mark Mothersbaugh.

5  A    Jerry and Mark.

6  Q    Yes.

7  A    We were borrowing Jerry and Mark from Warner Bros.  They

8  had -- they had produced their own album.  They produced it

9  in Ohio.  I met them through David Bowie, who told me about

10 them, and our aesthetic values got along, and we started to

11 work together.  So I just -- I was very confident, and I'm

12 sure Simon felt -- can -- could hear that I was so confident

13 in what I was doing, that I was confident in Jerry and -- in

14 Jerry and Mark working on these recordings.

15 Q    And then, as far as working on the recordings, were you

16 -- were you intending to be the designated artist?  Were --

17 did they -- do you --

18 A    I had total artistic control.  I would never consider --

19 Q    Do you know if Mark Mothersbaugh required any kind of

20 payment for going into the studio?

21 A    No.  They -- they did it as a favor to me because we had

22 worked together, and we were possibly talking about doing

23 other projects, although they, now, were going to go out and

24 tour.

25 Q    And so, as far as selecting the music, were the

1  publishing credits going to Mark Mothersbaugh --

2  A    Oh, it was their songs.  It was their songs.  They were

3  the publishers.

4  Q    So you were covering the songs --

5  A    I was doing covers -- covers of their songs --

6  hopefully, unique, different covers of their songs.

7  Q    And then how did you go into the preproduction stage of

8  putting this together -- these sound recordings?

9  A    Well, we didn't have to do a lot because I was always in

10 their recording studio when they were practicing and

11 recording.  So we did -- I think we were at SIR one day.  I

12 don't recall having any meetings -- Jerry and myself and Mark

13 sitting down and having, really, any meetings with Greg and

14 Trevor.  I -- I think Greg and Trevor first met Jerry and

15 Mark when they met them at the recording studio.

16 Q    And was Simon ever at the recording studio?

17 A    I recall Simon once at the -- one of the Devo recording

18 dates.  Yes.

19 Q    Okay.  And as far as putting it together, once you --

20 why don't you walk me through how the process worked on

21 getting those first three singles.

22 A    You just -- we put down the tracks.  The studio was

23 funded, and we put down the tracks, and then, you know, the

24 different instruments -- we mixed them -- well, we hadn't

25 mixed them yet.  I had to still put the -- my vocal on.

1  Q    Is it true that you were at every single mixing --

2  A    Well, I was at every single recording and everything.  I

3  was at everything.  Because I was -- I had artistic control

4  and quite -- and this is not to say anything about Greg and

5  Trevor but they -- Greg was a jazz musician, and he was a

6  well-known keyboardist, and he had never produced an album

7  before.  He had never produced an album before, and neither

8  had Trevor.  So I think with Devo's music being so punk- and

9  new wave-oriented that -- that, really, Greg -- I think it

10 was a learning process for them more than anything else.

11 Q    And did you help -- did you help them through that --

12 A    Because it wasn't their style.

13 Q    Did you help them through that process of --

14 A    Who?  Did I help Greg and Trevor?

15 Q    Greg -- Greg and Trevor.  Yes.

16 A    Well, Greg and Trevor really just observed Jerry and

17 Mark putting everything down.

18 Q    And then you were also instructing as far as the sounds

19 that you wanted to hear --

20 A    Well, we knew going in.  We really did know going in

21 what -- what we were doing.  I mean, maybe after -- you know,

22 "Space Girls" was totally on all 24 tracks.  I was concerned

23 that maybe it was -- I didn't want it to be too corny:

24 (indicating sounds).  It was dangerous.  It could have -- so

25 I started messing around with the highs and the lows so that